In the Matter of the Estate of HARRIET H. BRAINERD, Deceased.

Surrogate's Court, Kings County, December 12, 1938.

*Edmund J. Pickup,* for Arthur W. Peace, trustee, petitioner.

*Gross & Keck,* for Harry C. Williams, life beneficiary of the trust.

*Kuzmier, Milan & O'Rourke,* for the Central Hanover Bank and Trust Company, as executor, etc., of Harriet F. Williams, remainderman, objectant.

*Edward J. Connolly,* special guardian for Charles H. Williams, remainderman, whose whereabouts are unknown.

WINGATE, S. The question here raised concerns the propriety of the act of a trustee who has taken over securing realty in the process of salvaging certain mortgage investments, in paying to the life beneficiary rents received from such properties after deduction of current carrying charges, before complete repayment has been made of the new capital expended in taking over the property.

Three mortgage investments were the subject of salvage operations. The first was on premises 1938 Eighty-fifth street, in connection with which $902.68 of new capital was expended; $1,158.42 of such expenditures were required for acquiring title to

1211 Decatur street, and $323.70 in respect of 4204 Fourteenth avenue. Since their acquisition gross rents have been collected aggregating $1,760 on the Eighty-fifth street property, $1,140 on Decatur street and $1,580 on Fourteenth avenue, making a total of gross rents collected aggregating $4,480. During the same period the current maintenance charges of all three properties have totaled either $2,986.55 or $2,984.55 depending on which of the contradictory figures of Schedules A-3 and D-1 is correct. These are allocated, respectively, $1,298.80 or $1,300.80 on the Eighty-fifth street property, $668.93 on that on Decatur street and $1,016.82 on that on Fourteenth avenue. The net total of these current rentals, after deducting current maintenance charges, amounting to $1,495.45 or $1,493.45, has been treated as income, and despite the fact that the advances of new capital employed in the salvage operations have not been repaid, has in part, at least, been currently paid to the income beneficiary. Objection has been interposed to this action of the trustee, and a surcharge against him in this sum of $1,495.55 is sought by one interested in the remainder.

In an evaluation of the situation, the first point of interest is the error common to all of the parties to the proceeding of treating the salvage operations in respect of all of the properties as a unit. This is improper. Each property salvaged must be treated as a distinct entity, separate and apart from any other property in the same estate subject to a like operation. (*Matter of Chapal*, 269 N. Y. 464, 471; *Matter of Otis*, 276 id. 101, 111; *Matter of Pelcyger*, 157 Misc. 913, 940.) The adoption of this erroneous procedure renders potentially invalid the contentions of all parties to the present proceeding. The extent of such invalidity depends, however, upon the underlying controversy between the present parties respecting the permissibility of any income distribution whatsoever to the life beneficiary prior to the final completion of any individual salvage operation by the sale of the property acquired for salvage purposes.

In view of the explicit and wholly unequivocal statements of all courts to which the question has been presented since the modern doctrine of salvage was evolved, the existence of such controversy is somewhat surprising. In *Matter of Otis* (276 N. Y. 101, 115) it was said: " The courts below have held that net rents of a property acquired by a trustee through foreclosure cannot be treated as distributable income until the original capital has been fully restored. This means that, although a surplus remains after payment of carrying charges and of advances made out of principal, the life tenant can have nothing until the property is sold. We cannot take that

view * * * the trustee may distribute such surplus income in its discretion."

This statement, in itself, appears wholly clear. The operation in question is a salvage operation. Such operation is not completed until the unauthorized property thus acquired is sold. It is only when this has occurred that "the original capital has been fully restored." The surrogate had held (*Matter of Otis*, 158 Misc. 808, 816, 817) that no income would be paid in respect of any property which was still involved in the salvage operation and that, despite the fact that all principal advances had been repaid and there was a surplus of current income over like maintenance charges, the life tenant could still receive nothing. It was this ruling of which the Court of Appeals expressly disapproved in the foregoing quotation, holding that in such a situation "surplus income," that is, income in the hands of the trustee after repayment of all salvage charges, and of all current maintenance charges, may be distributed in the discretion of the trustee.

The scope of this declaration of the Court of Appeals is established beyond peradventure by its memorandum on reargument (*Matter of Otis*, 277 N. Y. 650) in which it said: "We think our opinion in *Matter of Otis* (276 N. Y. 101) does not imply that fiduciaries may distribute surplus income before all advances from principal are repaid."

The subsequent adjudications on the subject have been consonant with this view. (*Matter of Martin*, 165 Misc. 597, 612; *Matter of Eggers*, 167 id. 66.) It follows that payment of income to a life beneficiary from property still held in an uncompleted salvage operation is never permissible until the advances for salvage purposes have been fully repaid; thereafter, such payments may be made in the discretion of the trustee.

To determine whether the present trustee exceeded his authority in paying any income from the present properties to the life beneficiary requires an analysis of each of the three salvage operations.

In respect of the Eighty-fifth street property, the principal contribution for salvage expense amounted to $902.68. During the year ending April 30, 1935, the current receipts were $320 and the current expenditures for maintenance $339.86, thus showing a deficit of $19.86. On May 1, 1935, therefore, there was a prior lien for new funds advanced, amounting to $922.54, which must be fully satisfied before any surplus current income from this property might be paid to the life beneficiary under the conditional discretionary authority of the trustee. During each of the three succeeding years an operating profit was demonstrated, the total for the three years aggregating $481.06. This should have been

applied in reduction of the obligation for new funds advanced. Such application would result in a reduction of such total to $441.48.

The situation in connection with the Decatur street property is similar. The first year's operation showed a current deficit of $13.96 which increased the primary lien upon the property from $1,158.42 to $1,172.38. The succeeding two years showed an excess of current income over like expenditures of $485.03. This should have been applied to a solution of the advance of new funds, reducing the outstanding total thereof to $687.35.

The Fourteenth avenue property discloses a variation from the other two. Here the principal advances for salvage purposes totaled only $323.70. During the year ending April 30, 1937, the rentals received totaled $751, whereas the current expenses of maintenance were only $565.05, thus showing a net operating profit of $185.95. Applying this in solution of the salvage advances, left a balance on this account of $137.75. During the succeeding year the gross receipts were $829 and the carrying charges $451.77, showing a surplus of the former over the latter of $377.23. The application of the first $137.75 of this sum would satisfy in full the lien for new moneys advanced, leaving a balance of $239.48 which, under the rule of *Matter of Otis*, the trustee might, in his discretion, pay over to the life beneficiary. He affirmatively exercised his discretion in this regard and his act in this respect is not criticized as an abuse of discretion. His payment to this extent, therefore, must be sustained.

The foregoing analysis demonstrates that the trustee has credited to income account $481.06 of net current income from the Eighty-fifth street property, and $485.03 from Decatur street, or a grand total of $966.09, both of which belonged to principal. His present account shows an income credit still on hand of $970.31. This should be transferred to principal account in satisfaction of the credit due thereto. When this has been accomplished, a balance of $4.22 will still remain in the income account. When this has been accomplished, however, the advances from principal for the salvage operation in respect of the Fourteenth avenue property will still remain unpaid to that account. These, as noted, total $323.70. It follows, therefore, that the remaining credit to income account of $4.22 must be transferred to principal, after which there will still be a principal deficiency of $319.48, with which the trustee must be surcharged.

No objection has been interposed to the exercise by the trustee of his discretionary authority to apply the surplus rentals received from the Fourteenth street property to the use of the life beneficiary after the repayment of the new funds required for the salvage

operation. It follows that no issue presently exists in respect thereof.

The limits of the discretion of a trustee to pay current net income to a life beneficiary after all salvage advances have been repaid, have not thus far been made the subject of any judicial decision with which the court is familiar. The subject is, however, one which trustees may well ponder with care to the end that they may not be involved in possible future difficulties by a too liberal exercise of discretionary authority. The situation respecting the Fourteenth avenue property in this estate supplies an apt concrete example.

In *Matter of Chapal* (269 N. Y. 464, 472) the Court of Appeals stated: " In such an investment situation what is involved is the salvage of a security. The security it is to be remembered is a security not for principal alone but for income as well. On a sale, therefore, the proceeds should be used first to pay the expenses of the sale and the foreclosure costs and next to reimburse the capital account for any advances of capital for carrying charges not theretofore reimbursed out of income from the property. Then the balance is to be apportioned between principal and income in the proportion fixed by the respective amounts thereof represented by the net sale proceeds. In the capital account will be the original mortgage investment. In the income account will be unpaid interest accrued to the date of sale upon the original capital. The ratio established by these respective totals determines the respective interests in the net proceeds of a sale."

Since the land acquired is a security for both principal and income and since net current income is primarily usable in the solution of the overriding lien for salvage advances, for the benefit of principal and income alike, it would seem to follow as a logical matter that the net proceeds of operation were the joint property of both income and principal and that it might well be determined in future that if a net profit were received by reason of the operation of the property pending the sale which terminates the salvage operation, this would be the joint property of both income and principal in the ratio which is to be employed for a division of the ultimate sales proceeds.

If such decision were made, the result would follow that if current receipts were wholly paid to the life beneficiary and were high in comparison with the mortgage rate, or were the value of the realty itself to depreciate to any marked extent prior to the sale, that the payment of the entire current income to the life beneficiary might result in giving him more than he was entitled to receive, with a probable surcharge of the trustee as a result.

The present Fourteenth street property may be used as an illustration. At the time of taking title by the trustee, the face of the mortgage was $6,000 and bore interest at five and one-half per cent. Two years have now passed and the salvage expense has been completely repaid and the property is showing a current net return of $377.23 a year. Assume that it is not sold for another ten years and that this return was currently paid to the life beneficiary. In this time he would have received a total of $3,772.30. Assume further, that at the time of sale the property brought only $4,200, which would be merely an allowance of three per cent depreciation, which is readily conceivable. The annual interest at the mortgage rate is $330. The sum to which the life beneficiary would have been entitled at the time of sale would, therefore, be twelve times this figure, namely, $660 for the past two years and $3,300 for the next ten, or a total of $3,960. The total investment in the property, principal and interest, as of the date of ultimate sale, would accordingly be $9,960, of which 396/996ths would belong to income and 600/996ths to principal. The amount for division would be the $4,200 received on the sale plus the $3,772.30 net profit from operation, a total of $7,972.30. The share of the income beneficiary in this would be $3,169.70, with the result, if the entire current net income had been paid over to him, that the act of the trustee, in so doing, as demonstrated by the event, would appear to have been an abuse of discretion requiring his surcharge by the excessive sum paid, namely, $602.60.

The court is not to be deemed to declare that the foregoing would be the result. The law of salvage to this extent has not as yet been conclusively defined. It does suggest to the trustee, however, that this potentiality should be evaluated in his future decisions of the extent of exercise of his discretionary authority for payment of current net income to the life beneficiary.

To the extent hereinbefore indicated, the objection to the present account will be sustained.

Enter decree on notice in conformity herewith.